**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| **WILLIAM HENRY NORTON and**<br>**CHRISTI NORTON (h/w)**<br>1396 Brighton Avenue<br>Myrtle Beach, South Carolina 29588<br><br>*Plaintiffs*<br>v.<br><br>**SIG SAUER, INC.**<br>72 Pease Boulevard<br>Newington, New Hampshire 03801<br><br>*Defendant.* | **CIVIL CASE NUMBER:**<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs, William Henry Norton and Christi Norton, by and through his counsel, Saltz Mongeluzzi Bendesky P.C., hereby states the following Complaint in Civil Action against Defendant Sig Sauer, and in support thereof, avers as follows:

## PARTIES

1. Plaintiff, William Henry Norton (hereinafter, "Plaintiff" or "Sgt. Norton"), is an adult individual who resides at 1396 Brighton Avenue, Myrtle Beach, South Carolina 29588.

2. Plaintiff, Christi Norton (hereinafter, "Plaintiff" or "Mrs. Norton"), is the wife of William Norton, and an adult individual who resides at 1396 Brighton Avenue, Myrtle Beach, South Carolina 29588, and makes claims of loss of consortium as described herein.

3. Defendant, Sig Sauer, Inc. (hereinafter, "Sig Sauer"), is an American corporation with a principal place of business at 72 Pease Boulevard, Newington, New Hampshire 03801.

1

4.     At all relevant times, Sig Sauer was acting by and through its employees, servants, and agents, acting within the course and scope of their employment, service and agency.

5.     At all times relevant to this action, Sig Sauer was engaged in the design, manufacture, distribution, and sale of a variety of firearms to customers across the country, including Sgt. Norton's employer, and others across South Carolina.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are completely diverse and the amount-in-controversy exceeds $75,000, excluding interest and cost.

7.     Defendant has a principal place of business in New Hampshire and, accordingly, is a citizen of New Hampshire.

8.     Defendant does business in and is subject to personal jurisdiction in this judicial district pursuant to South Carolina's long-arm statute, S.C. Code Ann. § 36-2-803.

9.     Sig Sauer is engaged in substantial, continuous, regular, and systematic business in South Carolina, including the marketing, distribution, and sale of firearms to individuals, law enforcement agencies, and dealers located in South Carolina.

10.     Sig Sauer designed, manufactured, and distributed the Sig Sauer M400 rifle that caused Plaintiff's injuries.

11.     Plaintiff's M400 rifle was issued to him by his employer, the North Myrtle Beach Police Department in South Carolina.

12.     Defendant is therefore subject to both general and specific jurisdiction due to its conduct and actions within South Carolina.

13.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(3).

2

## FACTUAL ALLEGATIONS

### a. The Sig Sauer M400 Rifle

14.    Sig Sauer designs and manufactures firearms for sale to military and commercial markets throughout the United States and internationally. It markets and sells its products directly and through dealers.

15.    The Sig Sauer M400 (hereinafter "M400") is an AR platform rifle with a direct gas-impingement[1] operating system.

16.    The M400 has a "safety selector" wherein the firing mode of the rifle can be changed by the user rotating a switch 90 degrees:



SAFE            SEMI            AUTO
                             (M400 PRO ONLY)

*M400 Operator's Manual, p. 33*

17.    There is safety selector switch located on either side of the rifle.

---

[1] A direct gas-impingement operating system uses propellant gas to cycle the action of the rifle.



18.     The M400 Operator's Manual represents that when the switch is in "SAFE" position, the firearm will not fire:



### 9.2 SAFETY SELECTOR

The SIG M400 features an ambidextrous safety selector. Rotating either safety selector 90 degrees changes the firing mode.

- The SAFE position prevents the firearm from firing by blocking the action of the trigger. The safety selector can only be rotated to SAFE when the hammer is cocked.
- The SEMI position is for the semi-automatic mode and allows the firing of one round each time the trigger is pressed rearward.
- PRO models may be equipped with AUTO position that allows continuous firing when the trigger is held to the rear.

*M400 Operator's Manual, p. 33*

19.     Sig Sauer extensively markets the M400 to law enforcement agencies. *See* https://www.sigsauer.com/defense-m400.

20. Sgt. Norton was issued a Sig Sauer M400 rifle in connection with his duties as a Sergeant for the NMBPD.

21. In its marketing materials directed towards law enforcement and military for the M400, Sig Sauer declares:

> With its combat-proven lineage, user-driven enhancements, and future-ready architecture, the SIG SAUER M400 is the ultimate AR platform for those who refuse to compromise on performance, adaptability, and reliability.

*Sigsauer.com/defense-m400*

22. Despite this representation, despite having his rifle set to "SAFE" position, and despite neither of his hands being on the rifle, Sgt. Norton's M400 contained design and/or manufacturing defects that permitted the rifle to discharge unintentionally at the time of the incident.

### b. Plaintiff's Incident

23. At all relevant times, Plaintiff, William Henry Norton, was a Sergeant with the North Myrtle Beach Police Department (hereinafter "NMBPD"), with extensive law enforcement and firearms training and experience.

24. Sgt. Norton has served as a firearms instructor since 2012, including as a senior firearms instructor for the City of North Myrtle Beach

25. Sgt. Norton began working for the NMBPD on April 19, 2004.

26. At all relevant times, Plaintiff was carrying his duty-issued Sig Sauer M400 rifle.

27. On May 25, 2025, the Horry County Police Department (hereinafter, "HCPD") and the NMBPD responded to reports of a shooting involving multiple gunshot victims at a boat dock on Watson Avenue in Little River, South Carolina. There were reports of victims and possibly the shooter in the water.

28. NMBPD had jurisdiction in the waterway and kept a boat docked at the Harbourgate Marina (hereinafter "Marina"), located at 2111 Little River Neck Road, North Myrtle Beach, South Carolina.

29. Plaintiff responded to the Marina along with several other NMBPD officers.

30. Upon arrival at the Marina, Plaintiff chambered a round, had the safety on, and used positioned his rifle front of him, consistent with his training.

31. Plaintiff's M400 was positioned in a chest-indexed carry, with the muzzle pointed downward, and the fire control group centered on Sgt. Norton's chest.

32. Plaintiff specifically checked the safety selector on his M400 rifle and confirmed that the safety on his rifle was on as he approached the gate at the Marina.

33. Once at the gate, Sgt. Norton raised his right hand to unlock the gate and raised left hand to push the gate open.

34. While both of Sgt. Norton's hands were on the gate, his M400 rifle suddenly and unexpectedly discharged, twice.

35. Upon information and belief, an eyewitness, located on her balcony overlooking the Marina, video recorded the incident on her cellphone.

36. The video recorded by the eyewitness depicts the moments leading up to the incident, and the moment Sgt. Norton's rifle unintentionally discharged:

6



*Images from eye-witness video[2]*

37.    Following the incident, the South Carolina Law Enforcement Division (hereinafter "SLED") conducted an investigation, and after interviewing multiple witnesses and reviewing the eye-witness video, the SLED investigation confirmed:

---

[2] The full eyewitness video can be viewed in the link below:
https://smb.filev.io/r/s/15142qqD9IhfHjqSyjuEwlPsuLAU5pmMVOxnnVCEwf6uyUWig50Eg7wh

While en route to the Harbourgate Marina, Sgt. Norton did a function check on his Sig-Sauer M400 Rifle. Sgt. Norton checked the rifle bolt and trigger to make sure the rifle was working properly. Sgt. Norton then checked his red dot, front sight, and rear sight to confirm everything was working properly. (See Attachment 5)

Once the NMBPD officers arrived at the Harbourgate Marina, Sgt. Norton told Det. Espanol and Det. Smith to stay at the marina while Sgt. Norton, Det. Bellamy, and Det. Pollock took the boat to assist the HCPD. While walking to the gate to enter the boat dock, Sgt. Norton chambered a round, placed the safety on, and slung his rifle in front of him. Sgt. Norton used the rifle strap to secure the rifle to the front of his vest. Once Sgt. Norton arrived at the gate, Sgt. Norton used his right hand to pull up the lever and his left hand to push the gate open. Sgt. Norton's rifle accidentally discharged twice, shooting Sgt. Norton in the left leg. (See Attachments 1, 2, 4, 5, 6, 7, 8, 9, and 10)

*SLED Investigative Report: Conclusions, pg. 12-13*

38.     When his M400 unintentionally discharged, the first round struck the water a few feet in front of Sgt. Norton.

39.     The second round entered Sgt. Norton's left upper leg, traveled downward through his leg, and came to rest in his left foot.

40.     At the time his M400 unintentionally discharged, Sgt. Norton did not know where the gunshot came from. He attempted to run for cover.

41.     While trying to run for cover, Sgt. Norton's body collapsed.

42.     He could feel "bone on bone" twisting around his femur and knee area.

43.     At this point, Sgt. Norton could no longer stand or walk.

44.     Sgt. Norton instead tried to crawl towards the police vehicle for cover.

45.     Plaintiff's fellow officers then located Sgt. Norton, brought him to cover, and applied a tourniquet to slow the flow of blood pouring from his leg.

46. From the scene, Plaintiff was transported to a nearby hospital, but due to the severity of his injuries, Plaintiff needed to be transferred to a second hospital for emergency surgery.

47. Plaintiff required two surgeries and extensive ongoing treatment.

48. A rifle should not fire when the fire control selector is set to "SAFE."

49. A rifle is defectively designed and unreasonably dangerous if it is capable of firing when the fire control selector is set to "SAFE" and without the user touching the trigger.

50. As a direct and proximate result of Defendant's conduct, the end of Sgt. Norton's left thigh bone and kneecap were shattered when his M400 discharged into his leg. He further sustained a fracture to his left tibia and to the third toe on his left foot. He suffered an 80% loss of patella mass, with the remaining 20% anchored by synthetic tape.

51. The bullet remained lodged in his left foot until it was surgically removed.

52. Plaintiff required emergency external fixation of the left femur on May 26, 2025, followed by staged reconstruction on May 27, 2025, consisting of intramedullary nailing, open treatment of the patella and supracondylar fractures, and removal of the external fixation device.

53. During hospitalization, Plaintiff suffered acute blood loss anemia requiring blood transfusions, rhabdomyolysis, and multiple metabolic abnormalities.

54. Plaintiff subsequently developed wound dehiscence requiring further emergency treatment:



*Sgt. Norton's Injuries*

55.    While the full extent of the physical damage to Sgt. Norton's leg is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

56.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability, and other liability-producing conduct, Sgt. Norton was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Sgt. Norton has in the past and is reasonably likely to require medicines, medical care and treatment. Sgt. Norton has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Sgt. Norton has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Sgt. Norton has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Sgt. Norton's great loss and

detriment. The incident has resulted in substantial physical harm and related trauma to Sgt. Norton, who has received substantial and ongoing treatments and medicines.

## COUNT I: NEGLIGENCE

*William Henry Norton v. Sig Sauer, Inc.*

57.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

58.     At all relevant times, Sig Sauer owed Plaintiff the duty to design the M400 rifle in such a manner and with the exercise of reasonable care, to prevent it from discharging without an intentional trigger pull, before selling the rifle and placing it into the stream of commerce.

59.     At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect, and/or test its M400 rifles in such a manner and with the exercise of reasonable care, to prevent the rifle from discharging without an intentional trigger pull, before selling the rifle and placing it into the stream of commerce.

60.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the M400 rifle, including Plaintiff, of known or suspected defects that rendered the rifle unreasonably dangerous to handle or use.

61.     Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent, careless, and reckless acts:

a)  By failing to use due care in designing and manufacturing the M400 rifle to prevent unintended discharges;

b)  By failing to use due care in designing the M400 rifle, failing to incorporate adequate safety mechanisms to prevent unintended discharges;

c)  By failing to use due care in designing, manufacturing, and testing the M400 rifle's internal components, including the fire control group, to prevent unintended discharges;

d) By failing to use due care in designing, manufacturing, and testing the M400 rifle's safety selector to prevent unintended discharges;

e) By failing to conduct reasonable tests and/or inspections to discover the defective, hazardous, and unreasonably dangerous conditions relating to the rifle's ability to discharge without an intentional trigger pull as described above;

f) By negligently failing to unambiguously warn purchasers and end users of the rifle, including Plaintiff and NMBPD, of said defective, hazardous, and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

g) By failing to discover the defective, hazardous, and unreasonably dangerous conditions relating to the rifle's ability to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants, or agents of Sig Sauer had an opportunity to inspect, service, and work on the rifle;

h) By misrepresenting the dangers and hazards posed by the rifle;

i) By misrepresenting that the rifle would not fire without an intentional trigger pull and/or that the safety selector, when engaged, would mechanically prevent the firearm from discharging;

j) By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

k) By failing to design a firearm that would be safe for all users to operate under foreseeable circumstances, including routine carry and tactical deployment by law enforcement;

l) By failing to ensure the M400 rifle would not discharge without an intentional trigger pull under normal conditions of carry and use; and

m) Other negligent acts and omissions to be developed during discovery.

62. The catastrophic gravity of harm that may result from a firearm that discharges without an intentional trigger pull is foreseeable and always was foreseeable to Sig Sauer.

63. Sig Sauer knew or should have known that exposing users to the dangerous and defective hazardous conditions existing in the rifle would or could give rise to seriously bodily injury to its users, up to and including death.

12

64.    Plaintiff could not realize the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

65.    Sig Sauer's conduct constitutes willful, wanton, and reckless disregard for the safety of its users within the meaning of S.C. Code Ann. §15-32-510.

66.    Sig Sauer's negligence directly and proximately caused the discharge and Plaintiff's injuries.

67.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered the injuries described above and incorporated herein.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendant Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT II: STRICT PRODUCT LIABILITY

*William Henry Norton v. Sig Sauer, Inc.*

68.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

69.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers, and/or distributors, is strictly liable under S.C. Code Ann. §15-73-10, which codifies §402A of the *Restatement (Second) of Torts*, because:

a) Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the M400 rifle that injured Plaintiff;

b) The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c) The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce;

d) The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

70.     Pursuant to S.C. Code Ann. §15-73-40, the actual design of the M400 rifle was defective, causing it not to function in a manner reasonably expected by an ordinary consumer of firearms. An ordinary consumer of firearms reasonably expects that a rifle will not discharge without an intentional trigger pull. The M400 rifle failed to meet this expectation when it discharged twice while Plaintiff's hands were on a gate and not touching the rifle or its trigger, and while the safety selector was engaged.

71.     The M400 rifle was defective because it was less safe than an ordinary consumer of firearms would expect under S.C. Code Ann. §15-73-40(B)(1), given Sig Sauer's express representations that the rifle's manual safety selector, when engaged, would mechanically prevent discharge, and given the fundamental expectation of any ordinary firearms consumer that a rifle will not fire without a deliberate pull of the trigger.

72.     The M400 rifle was defective because it was distributed without sufficient warning that the rifle was capable of discharging without an intentional trigger pull.

73.     The M400 rifle was defective because it was distributed with an affirmative assurance that the safety selector switch, when in the "SAFE" position, would prevent the firearm from discharging.

74.     The defective design and condition of the M400 rifle was the proximate cause of Plaintiff's injuries.

75.     Plaintiff did not discover and could not have discovered the defective condition of the M400 rifle through reasonable inspection.

76.     Sig Sauer is strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendant Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT III: BREACH OF IMPLIED WARRANTY

*William Henry Norton v. Sig Sauer, Inc.*

77.	Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

78.	At all relevant times, Sig Sauer was in the business of marketing, selling, and distributing weapons, including Plaintiff's M400.

79.	Sig Sauer knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes and all other reasonably foreseeable uses.

80.	At all relevant times, Plaintiff used the M400 in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of Sig Sauer.

81.	Sig Sauer breached the above-referenced implied warranties as to the gun because, at the time it left Sig Sauer's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended due to Sig Sauer:

a. Failing to use due care in designing and manufacturing the M400's internal components allowing it to discharge without an intentional trigger pull, and while the safety selector switch is set to the "SAFE" position.

b. Failing to make reasonable tests and/or inspections to discover the potentially dangerous conditions relating to the gun's ability to discharge without an intentional trigger pull;

c. Negligently failing to unambiguously warn purchasers/users of the gun of said faulty conditions relating to its design and manufacture;

d. Failing to discover the potentially dangerous conditions relating to the gun's ability to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun.

82.     Plaintiff, as the end user of the gun, was a person who would foreseeably be injured by Sig Sauer breaching the implied warranties referenced in this Count and Sig Sauer's breach of the implied warranties of merchantability and/or fitness for a particular purpose, as alleged herein, directly and proximately caused the March 25, 2025 incident, and the resulting injuries to Plaintiff.

83.     As a direct and proximate result Defendant's breach of the implied warranties of merchantability and/or fitness for a particular purpose, as alleged herein, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendant Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT IV – LOSS OF CONSORTIUM

*Christi Norton v. Sig Sauer*

84.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

85.     At all relevant times hereto, Plaintiff, Christi Norton, was the lawfully wedded wife of husband-plaintiff, William Norton, with whom she lives.

16

86. As a result of the injuries sustained by Mr. Norton, wife-plaintiff Mrs. Norton has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

Respectfully submitted,

*Pro Hac Vice Forthcoming:*
ROBERT ZIMMERMAN, ESQUIRE
RYAN D. HURD, ESQUIRE
SAM A. HAAZ, ESQUIRE
LILY E. WINTER, ESQUIRE
**SALTZ MONGELUZZI & BENDESKY P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
(215) 496-8282
rzimmerman@smbb.com
rhurd@smbb.com
shaaz@smbb.com
lwinter@smbb.com

s/Luke A. Rankin
(Federal Bar # 5165)
Rankin and Rankin, PA
Conway, SC 29526
843-248-2405
Luke@RankinandRankin.com

Dated: April 28, 2026